IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


JEFFREY PHILLIPS,                          :
                                           :
                    Petitioner,            :
                                           :
          v.                               :        Civil Action No. 20-885-GBW
                                           :
ROBERT MAY, Warden, and                    :
ATTORNEY GENERAL OF THE                    :
STATE OF DELAWARE,                         :
                                           :
                    Respondents.           :


─────────────────────────────

Jeffrey Phillips.  *Pro se* Petitioner.

Elizabeth McFarlan, Deputy Attorney General of the Delaware Department of
Justice, Wilmington, Delaware.  Attorney for Respondents.

─────────────────────────────


**<u>MEMORANDUM OPINION</u>**[1]


September 8 , 2023
Wilmington, Delaware

───────────────────

[1]This case was re-assigned to the undersigned's docket on September 7, 2022.

Williams, District Judge:

Presently pending before the Court is Petitioner Jeffrey Phillips'

("Petitioner") Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254.

(D.I. 1; D.I. 3)  The State filed an Answer in opposition, to which Petitioner filed a

Reply.  (D.I. 21; D.I. 25)  For the reasons discussed, the Court will deny the

Petition.

## I.    BACKGROUND

On January 27, 2008, Christopher Palmer was shot and killed inside an after-hours nightclub in Wilmington, Delaware.  Herman Curry witnessed the murder. More than four years later, on July 8, 2012, Curry and Alexander Kamara were shot and killed during a soccer tournament at Eden Park in Wilmington, Delaware. Wilmington Police Department ("WPD") officers investigated the 2008 and 2012 murders. The investigations revealed that the suspects in the homicides, Otis [Phillips] ["Otis"] and [Petitioner], were members of a criminal gang known as the "Sure Shots."

***Christopher Palmer Murder***.  There was a birthday party for Curry on January 27, 2008 at a nightclub on Locust Street in Wilmington. Palmer, the security guard responsible for checking guests for weapons prior to entry, denied three individuals—believed to be [Petitioner], Jovani Luna, and Dwayne Kelly—entry into the club because "one or more of them was armed." A bystander, Clayon Green, witnessed the trio of men return and saw one of them push Palmer after he was again denied entry. According to Green, "Palmer and his assailant fell into a nearby bathroom, Otis 'reached around' into the bathroom and Green heard three shots." Palmer died as a result of the gunshot wounds.  Curry also witnessed the incident and identified Otis as Palmer's shooter in a photo lineup.

Afterwards, Kelly told Paula Thompson—his girlfriend at the time—that he and Otis were going to New York and Kelly did not see Otis after that visit.

***Nightclub Incident.*** Four years later, on July 7, 2012, Jeffrey was involved in a shooting at The River nightclub. According to the State, Kelmar Allen's testimony established that Allen removed [Petitioner] from the club after [Petitioner] got into an altercation with a rival gang member. As Allen and Kirt Williams waited for an elevator, Christopher Spence shot at them, "killing Williams and wounding Allen." After running outside, Allen "saw [Petitioner] firing a .40 caliber gun at a person named 'Mighty,' " a rival gang member. The next day, Allen saw [Petitioner] at a house on Lamotte Street, where he and other Sure Shots members were "collecting guns and bullets in the basement of the home." According to Allen, the members were angry because they wanted to find the rival gang members from the night before. The Sure Shots leader, Seon Phillips ("Seon", Otis' brother, no relation to [Petitioner]), loaded a .40 caliber gun and gave it to [Petitioner].

***Eden Park Murder.*** On July 8, 2012, Curry organized an annual soccer tournament at Eden Park in Wilmington, Delaware. While Ricardo Brown was preparing food at the outdoor kitchen with Curry, he noticed two men walk through a gate onto the soccer field. Shortly after that, he heard "fire rockets go off" and "turned and saw one of the men shoot Curry while the other shot his gun 'wild[ly].'" Curry and Kamara died as a result of their gunshot wounds (the "Eden Park Homicides").

There were other witnesses to the homicides. Nearby soccer player, Raoul Lacaille saw two men approach Curry, tap him on the shoulder, and shoot him, identifying Otis as Curry's shooter. Omar Bromfield also heard what he described as firecrackers, saw a crowd running through the parking lot, and discovered shortly after that he had

been shot. Venus Cherry, a tournament participant, saw two men enter the field, approach Curry, tap him on the shoulder, and one said, "Ninja, run, pussy, today you are dead," prior to shooting him. According to Cherry, "[t]he second man turned toward the 'kitchen' area and fired his gun; a bullet hit Kamara and Cherry." Cherry identified Otis as Curry's shooter and [Petitioner] as Kamara's shooter.

Green witnessed Otis and [Petitioner] walk across the field and then "saw Otis shoot at Curry, and [Petitioner] shoot toward the parking lot as if to clear the way." Green then saw Otis and [Petitioner] return to a gold car, and saw Christopher Spence approach the car and shoot the driver, Serge. Minutes after the shooting, officers found the gold car crashed at a nearby intersection. Officer Corey Staats found a handgun on the rear seat, "and observed the semi-conscious driver bleeding from his torso." Upon searching the vehicle, police discovered a 9 mm handgun, .40 caliber handgun, and black baseball cap containing DNA that matched that of Otis. According to firearm examiner Carol Rone, the shell casings collected from the Eden Park crime scene were fired from the recovered firearms.

Officers searched the surrounding area for the two men who had fled from the crashed gold car and located Otis and [Petitioner] in a back yard approximately four blocks north of Eden Park. A brief standoff followed, and then the officers arrested Otis and [Petitioner]. The police noticed [Petitioner] was wounded from a gunshot in the leg and discovered 20 rounds of 9 mm ammunition in his pants pocket.

The State's primary witness [Petitioner] was Allen. During his direct testimony, Allen asserted that [Petitioner] was a member of the Sure Shots, had received a loaded .40 caliber semi-automatic handgun from the leader of the Sure Shots, Seon, just prior to going to Eden Park on July 8, 2012, and was a willing participant in the

3

shooting that place in Eden Park on July 8, 2012. Prior to trial, Allen pled guilty to Gang Participation. The sentence imposed by the trial judge was a period of incarceration suspended for time served (119 days) followed by level III probation.

***Gang Participation***. The Sure Shots originated in Delaware in 1995 and was involved primarily in illegal drug trafficking. Sure Shots members had a reputation of carrying and using their firearms and engaging in various assaults, shootings, and homicides. The State alleges that Otis and [Petitioner] were members of the Sure Shots. This allegation is predicated upon the WPD's investigation into the Palmer murder, the nightclub incident, and the Eden Park Homicides, as well as an altercation at a Royal Farms (the "Royal Farms Incident").

On February 26, 2012, Shanice Kellam, her brother, Jeremy Showell, and three other friends went to a Royal Farms store in Bridgeville, Delaware. As they entered the store, Kellam heard a man say "[y]ou're a bad bitch," to which Showell responded, "she's not a bitch, she's a lady." A group of men approached them and one punched Kellam in the face. The men then attacked Kellam and Showell. A second carload of men arrived at the Royal Farms and joined the first group in their attack of Kellam and Showell. The altercation was captured on video and Detective Curley identified [Petitioner] and other members of the Sure Shots gang as Kellam's and Showell's assailants. The WPD homicide investigations and the Royal Farms Incident constituted the predicate offenses for the Gang Participation charge against [Petitioner].

*Philips v. State*, 154 A.3d 1146, 1150-52 (Del. 2017).

On February  2013, a Delaware grand jury issued a fifty-four count reindictment charging Petitioner, Otis, and fifteen other co-defendants with gang

participation and charges associated with the activities of the Sure Shots gang.

Specifically, Petitioner was charged

> with two counts of Murder in the First Degree, Attempted Murder in the First Degree, Gang Participation, Conspiracy in the First Degree, Reckless Endangering in the First Degree, Four Counts of Possession of a Firearm During the Commission of a Felony, Riot, Conspiracy in the Second Degree, Disorderly Conduct, Two Counts of Assault in the Third Degree, and Criminal Mischief. The State sought the death penalty for [Petitioner].
>
> The Superior Court denied severance motions and, instead, conducted a joint capital trial of [Petitioner] and Otis that began on October 20, 2014 and lasted 21 days. On November 21, 2014, the jury convicted [Petitioner] of Murder in the First Degree, Manslaughter (as a lesser-included offense), Gang Participation, Conspiracy in the First Degree, Four Counts of Possession of a Firearm During the Commission of a Felony, Assault in the Second Degree, Reckless Endangering in the First Degree, and Disorderly Conduct (as a lesser-included offense). The jury acquitted [Petitioner] of Assault in the Third Degree and Conspiracy in the Second Degree.
>
> The penalty hearing began on December 18, 2014, and the jury found " 'two in the affirmative, 10 in the negative' on the question of whether the aggravating circumstances outweighed the mitigating circumstances." The State withdrew its intent to seek the death penalty on September 4, 2015, and the Superior Court sentenced him to life imprisonment and an additional 72 years in prison, followed by decreasing levels of supervision, for the remaining convictions.

*Phillips*, 154 A.3d 1149–50. Petitioner appealed, and the Delaware Supreme Court

affirmed his convictions on January 17, 2017. *See Phillips*, 154 A.2d at 1161.

5

On April 10, 2017, Petitioner filed a *pro se* motion for postconviction relief under Delaware Superior Court Criminal Rule 61 ("Rule 61 motion") and a request for the appointment of counsel. (D.I. 20-23) A Superior Court Commissioner granted the motion to appoint counsel, and postconviction counsel filed an amended Rule 61 motion on July 18, 2018. (D.I. 20-25) In March 2019, the Commissioner issued a Report and Recommendation that Petitioner's Rule 61 motion should be denied. *See State v. Phillips*, 2019 WL 1110900, at *8 (Del. Super. Ct. Mar. 11, 2019). The Superior Court adopted the Report and Recommendation and denied the Rule 61 motion on July 16, 2019. (D.I. 20-1 at Entry No. 202) The Delaware Supreme Court affirmed the Superior Court's decision. *See Phillips v. State*, 227 A.3d 138 (Table), 2020 WL 1487787, at *6 (Del. Mar. 25, 2020).

## II. GOVERNING LEGAL PRINCIPLES

### A. The Antiterrorism and Effective Death Penalty Act of 1996

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "to reduce delays in the execution of state and federal criminal sentences . . . and to further the principles of comity, finality, and federalism." *Woodford v. Garceau*, 538 U.S. 202, 206 (2003). Pursuant to AEDPA, a federal court may consider a habeas petition filed by a state prisoner only "on the ground that he is in custody in violation of the Constitution or laws or treaties of the

6

United States." 28 U.S.C. § 2254(a). Additionally, AEDPA imposes procedural

requirements and standards for analyzing the merits of a habeas petition in order to

"prevent federal habeas 'retrials' and to ensure that state-court convictions are

given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693

(2002).

### B. Exhaustion and Procedural Default

Absent exceptional circumstances, a federal court cannot grant habeas relief

unless the petitioner has exhausted all means of available relief under state law.

*See* 28 U.S.C. § 2254(b); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842-44 (1999);

*Picard v. Connor*, 404 U.S. 270, 275 (1971). AEDPA states in pertinent part:

> An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court
> shall not be granted unless it appears that –
>
> (A) the applicant has exhausted the remedies available in
> the courts of the State; or
>
> (B)(i) there is an absence of available State corrective
> process; or (ii) circumstances exist that render such
> process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1). This exhaustion requirement, based on principles of

comity, gives "state courts one full opportunity to resolve any constitutional issues

by invoking one complete round of the State's established appellate review

process." *O'Sullivan*, 526 U.S. at 844-45; *see Werts v. Vaughn*, 228 F.3d 178, 192

7

(3d Cir. 2000).

A petitioner satisfies the exhaustion requirement by demonstrating that the habeas claims were "fairly presented" to the state's highest court, either on direct appeal or in a post-conviction proceeding, in a procedural manner permitting the court to consider the claims on their merits. *See Bell v. Cone*, 543 U.S. 447, 451 n.3 (2005); *Castille v. Peoples,* 489 U.S. 346, 351 (1989).  If a petitioner raised the issue on direct appeal in the correct procedural manner, the claim is exhausted and the petitioner does not need to raise the same issue again in a state post-conviction proceeding.  *See Lambert v. Blackwell,* 134 F.3d 506, 513 (3d Cir. 1997).

If a petitioner presents unexhausted habeas claims to a federal court, and further state court review of those claims is barred due to state procedural rules, the federal court will excuse the failure to exhaust and treat the claims as exhausted. *See Coleman v. Thompson*, 501 U.S. 722, 732, 750-51 (1991) (such claims "meet[] the technical requirements for exhaustion" because state remedies are no longer available); *see also Woodford v. Ngo*, 548 U.S. 81, 92-93 (2006).  Such claims, however, are procedurally defaulted.  *See Coleman*, 501 U.S. at 749; *Lines v. Larkins*, 208 F.3d 153, 160 (3d Cir. 2000).  Similarly, if a petitioner presents a habeas claim to the state's highest court, but that court "clearly and expressly" refuses to review the merits of the claim due to an independent and adequate state procedural rule, the claim is exhausted but procedurally defaulted. *See Coleman*,

501 U.S. at 750; *Harris v. Reed*, 489 U.S. 255, 260-64 (1989).

Federal courts may not consider the merits of procedurally defaulted claims

unless the petitioner demonstrates either cause for the procedural default and actual

prejudice resulting therefrom, or that a fundamental miscarriage of justice will

result if the court does not review the claims. *See McCandless v. Vaughn,* 172

F.3d 255, 260 (3d Cir. 1999); *Coleman,* 501 U.S. at 750-51.  To demonstrate cause

for a procedural default, a petitioner must show that "some objective factor

external to the defense impeded counsel's efforts to comply with the State's

procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  To demonstrate

actual prejudice, a petitioner must show that the errors during his trial created more

than a possibility of prejudice; he must show that the errors worked to his actual

and substantial disadvantage, infecting his entire trial with error of constitutional

dimensions." *Id.* at 494.

Alternatively, if a petitioner demonstrates that a "constitutional violation has

probably resulted in the conviction of one who is actually innocent,"[2] then a federal

court can excuse the procedural default and review the claim in order to prevent a

fundamental miscarriage of justice. *See Edwards v. Carpenter*, 529 U.S. 446, 451

(2000); *Wenger v. Frank*, 266 F.3d 218, 224 (3d Cir. 2001).  The miscarriage of

---

[2]*Murray*, 477 U.S. at 496.

justice exception applies only in extraordinary cases, and actual innocence means factual innocence, not legal insufficiency. *See Bousley v. United States*, 523 U.S. 614, 623 (1998); *Murray*, 477 U.S. at 496. A petitioner establishes actual innocence by asserting "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial," showing that no reasonable juror would have voted to find the petitioner guilty beyond a reasonable doubt. *See Hubbard v. Pinchak*, 378 F.3d 333, 339-40 (3d Cir. 2004).

### C. Standard of Review

If a state's highest court adjudicated a federal habeas claim on the merits, the federal court must review the claim under the deferential standard contained in 28 U.S.C. § 2254(d). Pursuant to § 2254(d), federal habeas relief may only be granted if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or the state court's decision was an unreasonable determination of the facts based on the evidence adduced in the trial. 28 U.S.C. § 2254(d)(1) & (2); *see Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001). A claim has been "adjudicated on the merits" for the purposes of § 2254(d) if the state court decision finally resolved the claim on the basis of its substance, rather than on a procedural or some other ground. *See*

10

*Thomas v. Horn*, 570 F.3d 105, 115 (3d Cir. 2009).  The deferential standard of §

2254(d) applies even "when a state court's order is unaccompanied by an opinion

explaining the reasons relief has been denied." *Harrington v. Richter*, 562 U.S. 86,

98 (2011).  As explained by the Supreme Court, "it may be presumed that the state

court adjudicated the claim on the merits in the absence of any indication or state-

law procedural principles to the contrary." *Id.* at 99.

Finally, when reviewing a habeas claim, a federal court must presume that

the state court's determinations of factual issues are correct.  *See* § 2254(e)(1).

This presumption of correctness applies to both explicit and implicit findings of

fact, and is only rebutted by clear and convincing evidence to the contrary.  *See* §

2254(e)(1); *Campbell v. Vaughn*, 209 F.3d 280, 286 (3d Cir. 2000); *Miller-El v.

Cockrell*, 537 U.S. 322, 341 (2003) (stating that the clear and convincing standard

in § 2254(e)(1) applies to factual issues, whereas the unreasonable application

standard of § 2254(d)(2) applies to factual decisions).

## III.   DISCUSSION

Petitioner's timely-filed Petition and Memorandum together assert the

following six Claims: (1) post-conviction counsel provided ineffective assistance

by failing "to hold previous counsel accountable for their acts and omissions

regarding [Petitioner's arguments concerning a] *Brady* violation, Carl Rone,

impeachment evidence, gang participation, and double jeopardy" (D.I. 1 at 5); (2)

11

there was insufficient evidence to support Petitioners conviction for gang

participation (D.I. 3 at 15-19; D.I. 17 at 4-8); (3) the trial court erred in denying

Petitioner's motion for a mistrial based upon the State's failure to disclose

exculpatory *Brady* material that its witness Allen participated in a witness

protection program (D.I. 3 at 19-24); (4) trial counsel provided ineffective

assistance by "failing to provide the trial court with appropriate information [about

Carl Rone] in a timely manner which would have precluded Rone from testifying

at all during trial" (D.I. 3 at 25-32); and (4) Petitioner was subjected to double

jeopardy because the State relied on his conviction for offenses to meet the

predicate criteria for his gang participation conviction (D.I. 3 at 33-38; D.I. 25 at

15-17).  In his Supplement to the Petition,[3] Petitioner asserts that the trial court

improperly instructed the jury with respect to gang participation, which the Court

construes as both supplementing Claim Two and as asserting an independent

argument that the gang participation jury instruction deprived him of his due

process right to a fair trial ("Supplemental Claim").   (D.I. 17)

### A.  Claim One:  Ineffective Assistance of Post-Conviction Counsel

In Claim One of his form § 2254 Petition, Petitioner contends that post-

conviction counsel provided ineffective assistance by failing "to hold previous

---

[3]Petitioner filed a Motion to Amend his Petition.  (D.I. 17)  Construing the Motion
to be a Motion to Supplement, the Court granted the Motion.  (D.I. 26)

counsel accountable for their acts and omissions regarding *Brady* violation, Carl

Rone, impeachment evidence, gang participation, and double jeopardy." (D.I. 1 at

5) When discussing Claim One in his Memorandum in Support, Petitioner asserts

that, "[a]s outlined below, whether the claim was exhausted on direct or in a PCRA

proceeding, none of the claims were properly developed or argued by any previous

attorney of record." (D.I. 3 at 3)

    The Court perceives three ways of interpreting Petitioner's presentation of

Claim One. First, Petitioner appears to be asserting a freestanding claim that

postconviction counsel provided ineffective assistance by failing to include in his

Rule 61 motion arguments that trial and appellate counsel rendered ineffective

assistance with respect to the substantive Claims in this Petition. There is no

federal constitutional right to counsel in collateral proceedings, and freestanding

claims of ineffective assistance of post-conviction counsel are not cognizable on

federal habeas review. *See* 28 U.S.C. § 2254(i) ("The ineffectiveness or

incompetence of counsel during Federal or State collateral post-conviction

proceedings shall not be a ground for relief in a proceeding arising under section

2254."); *Coleman*, 501 U.S. at 752; *Pennsylvania v. Finley*, 481 U.S. 551, 555

(1987). Thus, to the extent Claim One presents a freestanding ineffective

assistance of postconviction counsel claim, the Court will deny the Claim for

failing to present a proper basis for federal habeas relief.

Second, Petitioner appears to assert trial ("IATC"), appellate ("IACC"), and postconviction counsel's ineffective assistance as a method to avoid the procedural default of the potentially barred substantive arguments in Claims Four and Five (*i.e.*, Rone's credibility and double jeopardy issues).  The Court discusses those ineffective assistance claims within its discussion of those particular Claims.  *See, e.g., infra* at Section III. D & E (Claims Four and Five).

And finally, Petitioner appears to allege freestanding ineffective assistance claims regarding trial and/or appellate counsel's failure to "properly develop[] or argu[e]" the substantive claims that were adjudicated on the merits by the state courts (*i.e.*, Claims Two (insufficient evidence) and Three (*Brady* violation)).  The Court discusses the freestanding ineffective assistance of trial and appellate counsel allegations within its discussion of the related substantive Claims.  *See, e.g., infra* at Section III. B & C (Claims Two and Three).

### B. Claim Two:  Insufficient Evidence to Support Gang Participation Conviction

In Claim Two, Petitioner contends that there was insufficient evidence to support his conviction for gang participation.  Petitioner asserts that the State failed to prove all the elements of the offense because: (1) he was in Jamaica until 2011 and, therefore, he was not involved in the Palmer murder that occurred in 2008; (2) the Royal Farms incident did not amount to an enumerated felony under the gang

participation statute; and (3) the only evidence connecting him to the Sure Shots gang was Allen's "biased testimony." ( D.I. 3 at 17; D.I. 17 at 4-8; D.I. 25 at 5) On direct appeal, Petitioner argued that there was insufficient evidence to support his gang participation conviction because the State failed to prove that he actively participated in the Sure Shots gang. The Delaware Supreme Court rejected the argument, holding that, given the evidence in the record, a "reasonable jury could have concluded that [Petitioner's] conduct was more than just passive association with the Sure Shots." *Phillips*, 154 A.3d at 1160. Given the Delaware Supreme Court's adjudication of the issue, Claim Two will only warrant relief if the Delaware Supreme Court's decision was contrary to, or an unreasonable application of, clearly established federal law.

The clearly established federal law governing Petitioner's insufficient evidence claim is the rule articulated by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307 (1979). Pursuant to *Jackson*, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. This standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n.16. Additionally, "a federal habeas court faced with a record of historical facts that supports conflicting inferences must presume –

even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326; *see also Gov't of Virgin Islands v. Isaac*, 50 F.3d 1175, 1179 (3d Cir. 1995). Reviewing courts cannot make their own credibility determinations when evaluating the sufficiency of the evidence. *See United States v. Giampa*, 758 F.2d 928, 934-35 (3d Cir. 1985). Finally, "it is not necessary that the evidence exclude every reasonable hypothesis except that of guilt." *Jackson*, 443 U.S. at 326.

Here, although the Delaware Supreme Court did not cite to *Jackson* when it denied the insufficient evidence argument in Claim Two, it relied on Delaware caselaw articulating the *Jackson* standard applicable to such claims.[4] *See Fahy v. Horn*, 516 F.3d 169, 196 (3d Cir. 2008) (Supreme Court of Pennsylvania's decision was not "contrary to" clearly established federal law because it appropriately relied on its own state court cases which articulated the proper standard derived from Supreme Court precedent). Thus, the Delaware Supreme Court's decision is not contrary to clearly established law.

The Court's inquiry under § 2254(d)(1) is not over, because it must also determine if the Delaware Supreme Court reasonably applied *Jackson* to the facts

---

[4]The Delaware Supreme Court cited *Farmer v. State*, 844 A.2d 297, 300 (Del. 2004) which cited to *Monroe v. State*, 652 A.2d 560 (Del. 1995) which, in turn, set forth a standard identical to *Jackson*.

of Petitioner's case.  In Delaware, a person is guilty of gang participation if he (1)
actively participates in a criminal street gang; (2) knows that the members of the
street gang engage, or have engaged, in a "pattern of criminal gang activity" which
is defined as "the commission of[,] attempted commission of, conspiracy to
commit, solicitation of, or conviction of 2 or more" offenses set forth in section
616(a)(2) by two or more persons or on separate occasions; and (3) knowingly
promotes, furthers or assists in any felonious conduct by members of that gang.  11
Del. C. § 616(b).  When addressing Petitioner's argument that there was
insufficient evidence to support his gang participation conviction, the Delaware
Supreme Court explicitly referenced the substantive elements of the gang
participation statute, and opined that:

> A plain reading of the statute does not require the
> defendant to commit the predicate offenses himself.
> Therefore, the issue is whether a reasonable juror could
> find that [Petitioner] participated in the Sure Shots
> knowing it was engaged in a pattern of criminal gang
> activity and that he knowingly promote[d], further[ed], or
> assist[ed] in any criminal conduct by members of that gang
> which would constitute a felony under Delaware law.

*Phillips*, 154 A.3d at 1159.

As an initial matter, the Court notes that it must defer to the Delaware
Supreme Court's holding that the gang participation statute does not require a
defendant to commit the predicate offenses himself, because state law issues are

not reviewable in federal habeas proceedings. *See Estelle v. McGuire*, 502 U.S.

62, 67-68 (1991) (reiterating that "it is not the province of federal habeas court to

reexamine state-court determinations on state-law questions."). Nevertheless,

Petitioner's contention that he could not have been convicted of gang participation

because he did not have knowledge of, and also did not participate in any activities

with, the Sure Shots gang before his 2011 arrival to the United States is unavailing.

In his supplement to the Petition, Petitioner also argues that the Superior Court

improperly instructed the jury on gang participation because the instruction "didn't

individualize petitioner not being in the United States in 2008 in violation of the

due process clause of the United States constitution." (D.I. 17 at 4)  Petitioner

asserts that the gang participation instruction relieved the State "of its burden of

proof showing that petitioner individually participated in the 2008 murder of

Palmer." (*Id.*)  While couched in terms of a jury instruction challenge, the essence

of Petitioner's argument is that "tying" him "at trial to co-defendants who may

have killed Palmer" "created a reasonable likelihood that the jury convicted

petitioner of gang participation without a finding that he actually participated in the

murder of the victims." (*Id.* at 5-8)

 Contrary to Petitioner's contentions, while he may not have been aware of

the Sure Shots criminal activities prior to joining the gang, the evidence

demonstrates that he knew of, and participated in, the gang's criminal activities

after joining.  For instance, the jury in Petitioner's case was presented with the following evidence: (1) Petitioner was convicted of first degree murder (Curry) and manslaughter (Karama), which occurred during the Eden Park murders in 2012 while Petitioner and fellow gang member Otis were retaliating against a rival gang's actions; (2) Allen testified that Petitioner took care of business for the gang's leader; (3) Allen testified that Petitioner was involved in a shooting at a night club on July 7, 2012; (4) Allen testified he saw Petitioner at a house with other Sure Shots members at a house on July 8, 2012 and saw Seon hand Petitioner a loaded gun; and (5) the altercation at the Royal Farms on February 26, 2012 – which consisted of two groups of men harassing Kellam and Showell – was captured on video and showed Petitioner with other members of the Sure Shots gang. *Phillips*, 154 A.3d at 1159–60; (D.I. 20-19 at 43–46).

After considering the aforementioned evidence in a light most favorable to the State, the Court finds that a rational jury could conclude that: (1) Petitioner participated in the Sure Shots gang; (2) Petitioner knew the Sure Shots gang engaged in a "pattern of criminal gang activity"; and (3) Petitioner knowingly participated in the gang's violent activities.  Given these circumstances, the Court concludes that the Delaware Supreme Court reasonably applied *Jackson* in finding the evidence sufficient to sustain Petitioner's conviction for gang participation.

### 1. Related IATC/IAAC claims

Petitioner also appears to allege that trial and appellate counsel were ineffective for failing to properly develop or argue his contention that there was insufficient evidence to support his gang participation conviction. (D.I. 3 at 3; D.I. 17 at 11-14) These IATC and IAAC arguments are unexhausted because Petitioner did not present them to the Delaware Supreme Court on postconviction appeal. At this juncture, any attempt by Petitioner to raise the arguments in a new Rule 61 motion would be barred as untimely under Delaware Superior Court Rule 61(i)(1) and as second or successive under Rule 61(i)(2). *See* Del. Super. Ct. Crim. R. 61(i)(1) (establishing a one-year deadline for filing Rule 61 motions); Del. Super. Ct. Crim. R. 61(i)(2) (providing that second or successive motions shall be summarily dismissed unless they meet the pleading requirements of Rule 61(d)(2)(i) or (ii)). Although Rule 61 provides for an exception to its procedural bars if a Rule 61 motion "asserts a retroactively applicable right that is newly recognized after the judgment of conviction is final," no such right is implicated in the instant Claims. Similarly, the exceptions to the bars contained in Rule 61(i)(5) and (d)(2) do not apply to Petitioner's case, because he does not allege actual innocence, lack of jurisdiction, or that a new rule of constitutional law applies to the instant IATC argument. Therefore, the instant IATC and IAAC arguments are procedurally defaulted, which means that the Court cannot review their merits

20

absent a showing of either cause and prejudice or that a miscarriage of justice will result absent such review.

Petitioner attempts to establish cause by blaming post-conviction counsel for not raising the instant IATC and IAAC arguments in his Rule 61 proceeding. In *Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court held that inadequate assistance of counsel during an initial-review state collateral proceeding may establish cause for a petitioner's procedural default of a claim of ineffective assistance of trial counsel. *Id.* at 16-17. In order to obtain relief under *Martinez*, a petitioner must demonstrate that: (1) the defaulted ineffective assistance of trial counsel claim is substantial; and (2) the post-conviction attorney in his first state collateral proceeding was ineffective under the standards established in *Strickland*. *See Workman v. Sup't Albion SCI*, 915 F.3d 928, 937 (3d Cir. 2019).

To demonstrate that an ineffective assistance of trial counsel claim is substantial, a petitioner must show the claim has "some merit" under the standard applicable to certificates of appealability. *See Gaines v. Sup't Benner Township, SCI,* 33 F.4th 705, 711 (3d Cir. 2022). In other words, "a petitioner must 'show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.'" *Workman,* 915 F.3d at 938 (*quoting Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003)). "This

is a light burden; [a petitioner] must show only that his claim represents something more than the absence of frivolity or the existence of mere good faith." *Gaines*, 33 F.4th at 711 (3d Cir. 2022).  When making the threshold "some merit/substantiality" determination, the Court must "remain[ ] mindful that the 'substantiality' inquiry does not require full consideration of the factual or legal bases adduced in support of the claims." *Preston v. Sup't Graterford SCI*, 902 F.3d 365, 377 (3d Cir. 2018) (cleaned up); *see also Bey v. Sup't Greene SCI*, 856 F.3d 230, 238 (3d Cir. 2017) ("[W]hether [an ineffective assistance of counsel] claim is substantial is a threshold inquiry that does not require full consideration of the factual or legal bases adduced in support of the claims.") (cleaned up).

To satisfy the second *Martinez* requirement – that post-conviction counsel was ineffective – a petitioner must only show that post-conviction counsel's performance was deficient under the first prong of the *Strickland* standard, *i.e.*, "that his state post-conviction counsel's performance fell below an objective standard of reasonableness." *Workman*, 915 F.3d at 941.

Petitioner's attempt to establish cause under *Martinez* is unavailing.  As just discussed, the Court has concluded that the Delaware Supreme Court reasonably applied clearly established federal law when denying Petitioner's argument that there was insufficient evidence to sustain his gang participation conviction.  In addition, the fact that Petitioner's insufficient evidence arguments did not succeed

22

on direct appeal does not demonstrate that trial and appellate counsel were ineffective in their manner of arguing the issue. Therefore, his IATC and IAAC arguments are not substantial.

In the absence of cause, the Court will not address the issue of prejudice. Additionally, the miscarriage of justice exception does not excuse Petitioner's procedural default because he has not provided new reliable evidence of his actual innocence. Accordingly, the Court will deny the instant IATC and IAAC arguments as procedurally barred.

## C. Claim Three: *Brady* Violation

In Claim Three, Petitioner contends that the Superior Court erred in denying his motions for mistrial because the State failed to disclose exculpatory *Brady* material – the existence of Allen's cooperation agreement – which led to the introduction of prejudicial evidence – Allen's testimony connecting Petitioner to the Sure Shots gang activities. (D.I. 25 at 13) The Delaware Supreme Court denied Claim Three after concluding that there was no *Brady* violation. Therefore, Claim Three will only warrant relief if the Delaware Supreme Court's decision was contrary to, or an unreasonable application of, clearly established federal law.

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to

punishment, irrespective of the good faith or bad faith of the prosecution." *Id.*

"There are three components of a true *Brady* violation: The evidence at issue must

be favorable to the accused, either because it is exculpatory, or because it is

impeaching; that evidence must have been suppressed by the State, either willfully

or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S.

263, 281-82 (1999). The State's "duty to disclose such evidence is applicable even

though there has been no request by the accused," and includes "impeachment

evidence as well as exculpatory evidence." *Id.* at 280. "Such evidence is material

if there is a reasonable probability that, had the evidence been disclosed to the

defense, the result of the proceeding would have been different." *Id.* "In order to

comply with *Brady*, therefore, the individual prosecutor has a duty to learn of any

favorable evidence known to the others acting on the government's behalf in this

case, including the police." *Id.* at 281 (cleaned up).

The following excerpt from the Delaware Supreme Court's appellate

decision provides pertinent background information for Petitioner's instant

allegation.

> On the second day of trial, October 21, 2014, the State
> informed defense counsel that Maria DuBois had entered
> into a witness protection agreement with the State.
> Defense counsel immediately requested that the trial judge
> require the State to identify any other witnesses that had
> entered into witness protection agreements with the State,
> as well as an accounting of the financial benefits that they

had received pursuant to those agreements. Over the next several days, the State provided defense counsel with the witness protection agreements of four co-defendants and an accounting of the financial benefits paid to or on behalf of those State witnesses. Three of these witnesses testified.

The witness protection agreements were written documents that provided financial benefits in exchange for the witnesses' cooperation in the prosecution of various Sure Shots defendants, including [Petitioner]. The agreements required the witnesses "to testify truthfully if called as a witness" at trial. The agreements gave the Chief Deputy Attorney General of the Department of Justice "the sole authority to finally determine whether a material breach of this agreement by ... the witness [had] occurred and the appropriate remedies and sanctions."

The trial judge recognized that the witness protection agreement evidence had the potential to cause confusion. These agreements implied that the witness was in danger from any or all of the co-defendants in the case to such an extent that the State was willing to expend thousands of dollars to protect the witness. Conversely, the fact that the witnesses were receiving financial benefits as a result of their decision to testify against defendants had the potential to demonstrate bias.

Prior to the testimony of Maria DuBois, the trial judge ruled that the State could not ask any witness about a witness protection agreement during direct examination but the defense could cross-examine the witness about the financial benefits received as a result of being in witness protection. The trial judge advised the State to discuss this issue with their witnesses in advance of testifying, and that if the State raised the issue in its case-in-chief they did so at their "own peril." Defense counsel for [Petitioner] did not raise the issue of witness protection during the cross-examination of Maria DuBois or Michael Young, because

25

neither of those witnesses testified in a manner that inculpated [Petitioner].

Allen was called as a State witness on October 24, 2014. After a few foundational questions, the State placed Allen's plea agreement in front of him and asked him the following question:

> Q: Now, without again looking at the document, what, if any, benefits did the State promise you in exchange for your plea?
> A: Just that, just that, like, witness protection.

All of the attorneys immediately went to sidebar where the State informed the trial judge: "I've instructed this witness multiple times that I was not allowed to ask about witness protection ... [s]o I don't know why he mentioned that." Defense counsel for Jeffrey initially asked for a curative instruction but then requested a mistrial.

The trial judge denied the motion for mistrial and then permitted defense counsel to examine Allen outside the presence of the jury. During that examination, Allen revealed that he was in witness protection as a result of his fear of "everything that is going on", but not as a result of threats made by [Petitioner]. With regard to what the State had told Allen to say about witness protection, the following exchange occurred upon questioning by counsel for Jeffrey:

> Q: Mr. Allen, the prosecutors met with you before you testified, correct?
> A: Yeah.
> Q: And they instructed you not to talk about the witness protection, correct?

A: No, they didn't tell me not to talk about a witness protection—they didn't instruct me to talk about a witness protection.

Q: Not to talk about it?

A: No. I said they didn't instruct me. They just told me to tell the truth.

Q: There's never any discussion with you and the prosecutors about talking—not talking about witness protection?

A: No.

The State then asked Allen questions concerning prior discussions with him about witness protection:

Q: Did the State, did I today explain to you about witness protection?

A: Yes.

Q: Do you recall, do you recall me telling you that I wasn't going to ask you about witness protection?

A: Yes.

Q: Did I explain to you that defense counsel would then ask you about witness protection?

A: Yes.

Q: Then did I explain to you that I would then be able to stand up and ask you more?

A: After more, yeah.

Q: So what was your understanding with what I would ask you about witness protection?

A: Can you repeat that question to me?

Q: Yeah. What did you understand me saying when I said I wasn't going to ask you about witness protection and that only they could?

A: I didn't even really understand that.

Defense counsel for [Petitioner] renewed his motion for a mistrial, emphasizing that the State had not made it clear to its witness that evidence concerning witness protection

27

was not to be discussed unless specifically asked by the defense. Both defendants also argued that a curative instruction was insufficient. The trial judge denied the renewed motions for a mistrial.

Defense counsel for [Petitioner] then informed the trial judge of their intent to explore the issue of payments made to Allen pursuant to the witness protection agreement. Defense counsel for Otis objected to action by [Petitioner]. Both defendants then moved for a severance and a mistrial. Those motions were denied.

The Superior Court concluded that "Allen merely stated that his participation in witness protection was a benefit that he received under his plea agreement with the State," and that Allen's improper mention of his participation in witness protection was not the result of prosecutorial misconduct and "did not sufficiently prejudice either of the Defendants to warrant a mistrial." Instead, a previously prepared limiting instruction was given to the jury as follows:

> Ladies and gentlemen, the witness has testified that he currently has some involvement in the Witness Protection Program. There's no evidence before you that the defendants personally made any threats, directly or indirectly, against the witness. The fact that a witness received a benefit in the program may only be considered by you for the purpose of judging the credibility of the witness, it should not be considered by you in determining the guilt of the defendants.

*Phillips*, 154 A.3d at 1152–54.

On direct appeal, Petitioner argued that the Superior Court abused its discretion by denying his motions for a mistrial because the State's failure to

28

disclose the alleged exculpatory *Brady* material consisting of Allen's witness

protection agreement prior to trial resulted in the admission of Allen's prejudicial

testimony concerning the witness protection program.  The Delaware Supreme

Court treated Petitioner's main argument to be that the Superior Court should have

granted a mistrial because Allen's testimony was prejudicial.  *See Phillips*, 154

A.3d at 1154.  After concluding that the Superior Court did not err by not granting

a mistrial, the Delaware Supreme Court also held that,

> [t]o the extent the terms and conditions of Allen's participation in a witness protection program were *Brady* material, [Petitioner] received the information sufficiently in advance of Allen's testimony to use it effectively.  To the extent that Allen's comment to the jury that he received witness protection for his plea prejudiced [Petitioner], that prejudice was effectively ameliorated by the trial judge's limiting instruction

*Id.* at 1154–55.

　　While it is a violation of a defendant's due process rights for a prosecutor to

withhold evidence favorable to the accused, a "prosecutor is not required to deliver

his entire file to defense counsel, but only to disclose evidence favorable to the

accused that, if suppressed, would deprive the defendant of a fair trial."  *United

States v. Bagley*, 473 U.S. 667,  675 (1985).  Moreover, a delayed disclosure of

*Brady* material "that [a] defendant[ ] could use on cross-examination to challenge

the credibility of Government witnesses" does not violate the defendant's due

process rights if the material was disclosed in time for the defendant to effectively use the material at trial.  Due process is satisfied if such material is disclosed the day the witness testifies." *United States v. Higgs*, 713 F.2d 39, 43-4 (3d Cir. 1983).  The record supports the Delaware Supreme Court's factual determination that Petitioner was informed about Allen's witness protection agreement with sufficient time to use the knowledge effectively.  Therefore, the Court concludes that the Delaware Supreme Court reasonably applied *Brady* when denying Claim Two.

### 1. Related IATC/IAAC claims

Petitioner also appears to allege that trial and appellate counsel were ineffective for failing to properly develop or argue his contention that the State's late disclosure of Allen's participation in the witness protection program constituted a *Brady* violation.  These IATC and IAAC arguments are unexhausted and procedurally defaulted because Petitioner did not present them to the Delaware Supreme Court on postconviction appeal and he is barred from presenting the arguments in a new Rule 61 motion.  Petitioner attempts to excuse his default of the instant IATC and IAAC claims under *Martinez* by blaming postconviction counsel for not raising the arguments in his Rule 61 proceeding.  The attempt is unavailing because the IATC and IAAC arguments are not substantial; as just discussed, the Court has concluded that the Delaware Supreme Court reasonably

applied clearly established federal law when denying the *Brady* argument asserted in Claim Three.

Given Petitioner's failure to demonstrate cause, the Court need not address prejudice. Petitioner also has not demonstrated that the Court should review the merits of the instant IATC and IAAC arguments to avoid a miscarriage of justice. Accordingly, the Court will deny as procedurally barred Petitioner's allegation that trial and appellate counsel were ineffective in their presentation of his *Brady* argument.

### D. Claim Four: Carl Rone's Credibility

During Petitioner's trial in 2014, the State's ballistics expert Carl Rone testified that the shell casings collected from the Eden Park crime scene were fired from the firearms found in the car Petitioner used to flee the Eden Park murder scene. In May 2018, while Petitioner's Rule 61 proceeding was pending in the Superior Court, Rone was "arrested and charged with providing false time sheets for work that was not performed during 2016 and 2017." *Phillips*, 2019 WL 1110900, at *6. In his Rule 61 Reply Brief, Petitioner argued that Rone's recent criminal charges were "new material facts that bear on the integrity and reliability of [Petitioner's] conviction and should be examined to determine whether a new trial is warranted." *Id.* The Superior Court denied the argument, stating "at the time of [Petitioner's] trial, there was no evidence of wrongdoing by Rone from

2012-2014 (nor is there now) that would have lead Trial Counsel to make a

different approach with cross-examination." *Id.* The Superior Court further stated,

> [Petitioner] concedes that with the information available
> at the time of trial, "Rone's credibility was vigorously
> challenged, based on the dubious scientific validity of his
> methodology and his lack of current credentials."
> Delaware has consistently cautioned that the courts should
> not second-guess counsel's conduct through the distorting
> effects of hindsight. To the extent [Petitioner] believes
> Trial Counsel should have done something differently, he
> is incorrect. Viewing the case from Trial Counsel's
> perspective at the time, he could not have predicted the
> issues with Rone's later prosecution and his conduct at the
> time fell within the wide range of reasonable professional
> assistance.

*Phillips*, 2019 WL 1110900, at *7.

On post-conviction appeal, Petitioner argued that the Superior Court violated

his due process rights by failing to fully consider the credibility issues surrounding

Rone in the interest of justice. (D.I. 20-29 at 35) Petitioner also argued that the

Superior Court "mischaracterized [Petitioner's] argument as being an argument for

a new trial. [Petitioner] argued that he should be given an opportunity to explore

the bases of the Department's suspension and subsequent separation of

employment of Rone, to the extent that it related to Rone's credibility." (D.I. 20-

29 at 38) The Delaware Supreme Court construed Petitioner's argument as

invoking "Due Process rights and the interests of justice," and noted that he "does

not argue ineffective assistance of counsel or the new evidence exception [of Rule

61(i)(3)]." *Phillips v. State*, 227 A.3d 138 (Table), 2020 WL 1487787, at *3 (Del. Mar. 25, 2020). Since challenges to a witness' credibility must be raised during trial, the Delaware Supreme Court held that Petitioner's challenge to Rone's credibility was procedurally barred under Rule 61(i)(3). *Id.* at *4-5.

In Claim Four of this proceeding, Petitioner appears to assert the following arguments concerning Carl Rone. First, he asserts that trial counsel provided ineffective assistance during the October 14, 2014 *Daubert* hearing by failing to inform the trial court that Rone had let his certification lapse and that his methodology primarily consisted of relying on his own observations – both of which were factors underlying the criminal charges brought against Rone in 2018. (D.I. 3 at 26-32) Second, he asserts that he had a constitutional right to an evidentiary hearing and further discovery during his Rule 61 proceeding to investigate the effect Rone's criminal conduct in 2018 had on the veracity of his 2014 testimony in Petitioner's trial. (D.I. 25 at 14)

### 1. IATC during Daubert hearing

The record reveals that Petitioner did not exhaust state remedies for his instant IATC argument because he did not present it to the Delaware Supreme Court on postconviction appeal. At this juncture, any attempt by Petitioner to raise the argument in a new Rule 61 motion would be barred as untimely under Delaware Superior Court Rule 61(i)(1) and as second or successive under Rule

61(i)(2). *See* Del. Super. Ct. Crim. R. 61(i)(1) (establishing a one-year deadline for

filing Rule 61 motions); Del. Super. Ct. Crim. R. 61(i)(2) (providing that second or

successive motions shall be summarily dismissed unless they meet the pleading

requirements of Rule 61(d)(2)(i) or (ii)). Therefore, the instant IATC argument is

procedurally defaulted, which means that the Court cannot review its merits absent

a showing of either cause and prejudice or that a miscarriage of justice will result

absent such review.

Petitioner attempts to establish cause for his default under *Martinez* by

blaming post-conviction counsel for not raising the instant IATC argument in his

Rule 61 proceeding. His attempt is unavailing. During Petitioner's trial, trial

counsel filed a motion *in limine* to exclude Rone's expert testimony. *See State v.*

*Phillips*, 2015 WL 5168253, at *1 (Del. Super. Ct. Sept. 2, 2015). On October 14,

2014, the Superior Court ruled from the bench that Rone "was qualified and that

his methodology was correct." (D.I. 20-6 at 1) The Superior Court supplemented

that ruling with a written opinion. *See State v. Phillips*, 2015 WL 5168253, at *1

(Del. Super. Ct. Sept. 2, 2015). The Superior Court explicitly found that Carl Rone

"is qualified as an expert in firearms and toolmark identification under the

requirements of [Delaware Rule of Evidence] 702." *Id.* at *3.

The transcript of the hearing for Petitioner's motion *in limine* demonstrates

that trial counsel vigorously challenged Rone's qualification as an expert. The

fact that trial counsel's argument was unsuccessful does not constitute ineffective assistance. Consequently, Petitioner's instant IATC argument is not substantial.

In the absence of cause, the Court will not address the issue of prejudice. Additionally, the miscarriage of justice exception does not excuse Petitioner's procedural default because he has not provided new reliable evidence of his actual innocence. Accordingly, the Court will deny the instant IATC argument in Claim Four as procedurally barred.

## 2. Refusal to hold evidentiary hearing

The Court also rejects Petitioner's complaint that the Delaware state courts violated his due process rights by not holding an evidentiary hearing during his Rule 61 proceeding. The "federal role in reviewing an application for habeas corpus is limited to evaluating what occurred in the state or federal proceedings that actually led to the petitioner's conviction; what occurred in the petitioner's collateral proceedings does not enter into the habeas calculation." *Hassine v. Zimmerman*, 160 F.3d 941, 954 (3d Cir. 1998). Therefore, the failure to conduct an evidentiary hearing during a state collateral proceeding does not present an issue cognizable in this proceeding. *See Lambert v. Blackwell*, 387 F.3d 210, 247 (3d Cir. 2005) (explaining that "main event" for habeas purposes is original trial).

### E. Claim Five: Double Jeopardy

In Claim Five, Petitioner contends that the State's reliance on his conviction of offenses to meet the predicate criteria for his conviction of gang participation "violated the rights guaranteed him by the Double Jeopardy clause of the Fifth Amendment." (D.I. 3 at 33; D.I. 25 at 15)  In his Reply, Petitioner concedes that he defaulted the double jeopardy argument because he did not raise it on direct appeal or in his Rule 61 appeal.  (D.I. 25 at 15)  Consequently, in an attempt to establish cause for his default, Petitioner asserts that trial and appellate counsel were ineffective for failing to raise the double jeopardy argument during his trial and direct appeal, and also that postconviction counsel was ineffective for failing to raise the double jeopardy issue in his Rule 61 proceeding.  (*Id.*)

#### 1. Trial and appellate counsel's failure to raise a double jeopardy argument as cause

Petitioner's attempt to establish cause for his initial default by blaming trial and appellate counsel for failing to raise a double jeopardy claim during trial or on direct appeal is unavailing.  In his Rule 61 proceeding, Petitioner did not present any claims asserting that trial and appellate counsel were ineffective for failing to raise a double jeopardy violation with respect to his gang participation conviction. Consequently, his IATC and IAAC claims are procedurally defaulted, which

36

means that they cannot constitute cause for Petitioner's default of the substantive

double jeopardy claim. *See Edwards v. Carpenter*, 529 U.S. 446, 453-54 (2000).

Petitioner attempts to demonstrate cause for his default of these particular

IATC and IAAC arguments by blaming postconviction counsel for failing to

include the IATC and IAAC claims in his Rule 61 proceeding. His attempt fails to

trigger the *Martinez* exception to the procedural default doctrine, because the

underlying IATC and IAAC claims are not substantial. The Double Jeopardy

Clause prevents the imposition of multiple punishments for the same offense. *See*

*North Carolina v. Pearce,* 395 U.S. 711, 717 (1969), *overruled in part on other*

*grounds by Alabama v. Smith,* 490 U.S. 794 (1989). The traditional test for double

jeopardy claims is the same-elements test set forth in *Blockburger v. United States*,

284 U.S. 299 (1932). Pursuant to *Blockburger*, a court must analyze "whether each

offense contains an element not contained in the other; if not, they are the 'same

offense' and double jeopardy bars additional punishment and successive

prosecution." *United States v. Dixon*, 509 U.S. 688, 696 (1993). The rule

articulated in *Blockburger* is a "rule of statutory construction to help determine

legislative intent;" the rule is "not controlling when the legislative intent is clear

from the face of the statute or the legislative history." *Garrett v. United States*, 471

U.S. 773, 778-79 (1985). Consequently, "even if the crimes are the same under

*Blockburger*, if it is evident that a state legislature intended to authorize cumulative

punishments, a court's inquiry is at an end." *Ohio v. Johnson*, 467 U.S. 493, 499

n.8 (1984).  As the Supreme Court held in *Missouri v. Hunter*, 459 U.S. 359, 368-

69 (1983):

> [S]imply because two criminal statutes may be construed to proscribe the same conduct under the *Blockburger* test does not mean that the Double Jeopardy Clause precludes the imposition, in a single trial, of cumulative punishments pursuant to those statutes....
>
> Where... a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the "same" conduct under *Blockburger*, a court's task of statutory construction is at an end, and the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial.

*Missouri v. Hunter*, 459 U.S. 359, 368-69 (1983).

Here, the gang participation statute contains an element not found in the

statutes for the predicate offenses used to meet the criteria for Petitioner's gang

participation conviction, namely, "know[ledge] that the members of the street gang

engage, or have engaged, in a 'pattern of criminal gang activity'".[5]  *See e.g. United*

---

[5]The Delaware Supreme Court identified the relevant predicate offenses in Petitioner's case as including: (1) the February 26, 2012 Royal Farms incident – disorderly conduct as a lesser included offense of riot; (2) the July 8, 2012 murder of Curry; and (3) the July 8, 2012 manslaughter of Kamara. *See Phillips*, 154 A.3d at 1159-60.

States v. Felix, 503 U.S. 378, 389 (1992) ("A substantive crime and a conspiracy to commit that crime are not the 'same offences' for double jeopardy purposes."); United States v. Watkins, 339 F.3d 167, 177 (3d. Cir. 2003) (holding that a charge of conspiracy and the underlying crimes effectuating it are not the same offense under the Double Jeopardy Clause). Consequently, Petitioner's double jeopardy argument lacks merit. And, since trial and appellate counsel cannot be ineffective for failing to raise a meritless double jeopardy argument,[6] the instant IATC and IAAC claims fail to satisfy Martinez's substantiality requirement.

### 2. Posconviction counsel's failure to include a double jeopardy argument in Rule 61 proceeding

Petitioner attempts to establish cause under Martinez by blaming postconviction counsel for not including the substantive double jeopardy argument on postconviction appeal. An allegation of ineffective assistance of postconviction counsel can only excuse a default when the underlying claim is one of ineffective assistance of trial counsel. See Martinez, 566 U.S. at 12, 16-17. Here, Claim Five asserts a freestanding double jeopardy issue and not an ineffective assistance of trial counsel claim. Therefore, Martinez is inapplicable and does not provide cause for Petitioner's default.

---

[6] See United States v. Sanders, 165 F.3d 248, 253 (3d Cir. 1999) (counsel's failure to raise meritless arguments does not amount to ineffective assistance).

### 3. Prejudice and miscarriage of justice

Petitioner does not assert any other cause for his default of the double jeopardy argument in Claim Five.  Given his failure to demonstrate cause, the Court will not address the issue of prejudice.  In addition, Petitioner has not demonstrated a miscarriage of justice.  Accordingly, the Court will deny Claim Five as procedurally barred.

### F. Supplemental Claim Challenging Gang Participation Jury Instruction

In his Supplement, Petitioner contends that the gang participation jury instruction deprived him of his due process right to a fair trial because it relieved the State's burden of proving every element of the offense beyond a reasonable doubt.  (D.I. 17 at 8)  To the extent this argument should be viewed as an independent claim and not just as supplementing Claim Two, the argument is unexhausted and procedurally defaulted because Petitioner did not present tit to the Delaware Supreme Court on postconviction appeal and he is barred from presenting the argument in a new Rule 61 motion.[7]

---

[7]On direct appeal, Petitioner challenged the gang participation jury instruction by arguing that the "instruction read to the jury failed to properly define *mens rea* requirements as well as other elements of the offense."  (D.I. 20-18 at 40)  The instant due process argument is not the same as the argument raised on direct appeal.

Petitioner alleges ineffective assistance of trial and appellate counsel in an attempt to establish cause for his default.  Yet, since Petitioner did not present any IATC or IAAC claim based on counsel's failure to assert a due process challenge to the gang participation jury instruction in his Rule 61 proceeding or on postconviction appeal, the IATC and IAAC claims are themselves procedurally defaulted.  Consequently, trial and appellate counsel's actions cannot provide cause for his default of the instant jury instruction Claim.

In addition, postconviction counsel's failure to raise the instant due process challenge to the jury instruction cannot constitute cause under *Martinez*. *Martinez*'s limited exception to the procedural default doctrine does not apply here because the instant jury instruction Claim asserts a freestanding due process claim, rather than an ineffective assistance of trial counsel claim.

Petitioner does not assert any other cause for his default.  In the absence of cause, the Court will not address the issue of prejudice.  Additionally, the miscarriage of justice exception to the procedural default doctrine is inapplicable because Petitioner has failed to provide new reliable evidence of his actual innocence.  Therefore, the Court will deny the instant Claim as procedurally barred.

## IV.   CERTIFICATE OF APPEALABILITY

A district court issuing a final order denying a § 2254 petition must also decide whether to issue a certificate of appealability.  *See* 3d Cir. L.A.R. 22.2 (2011); 28 U.S.C. § 2253(c)(2).  A certificate of appealability is appropriate when a petitioner makes a "substantial showing of the denial of a constitutional right" by demonstrating "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Additionally, when a district court denies a habeas claim or petition on procedural grounds without reaching the underlying constitutional claims, the court is not required to issue a certificate of appealability unless the petitioner demonstrates that jurists of reason would find it debatable: (1) whether the claim or petition states a valid claim of the denial of a constitutional right; and (2) whether the court was correct in its procedural ruling. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Court has concluded that the instant Petition does not warrant relief. Reasonable jurists would not find this conclusion to be debatable.  Accordingly, the Court will not issue a certificate of appealability.

## V.    CONCLUSION

For the reasons discussed, the Court will deny the instant Petition without holding an evidentiary hearing or issuing a certificate of appealability.  The Court will enter an order consistent with this Memorandum Opinion.